SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D
APR 3 0 2010
J.T. NOBLIN, CLERK
BY_____DEPUTY

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(~~GULFPORT~~ Southern) DIVISION

| | |
|---|---|
| CAJUN MAID, LLC, ROBERT BARNETT, GULF SHORES SEA PRODUCTS, INC. and KEATH LADNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>BP, PLC; BP AMERICA, INC.; BP CORPORATION NORTH AMERICA, INC.; BP COMPANY NORTH AMERICA, INC.; BP PRODUCTS NORTH AMERICA, INC.; TRANSOCEAN, LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; HALLIBURTON ENERGY SERVICES, INC.; and CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION,<br><br>Defendants. | CASE NO. 1:10CV176 HSO-JMR<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

## I.   INTRODUCTION

1.   Plaintiffs are businesses and individuals who rely on the natural resources found the Gulf of Mexico, including fish, oysters, and other aquatic life, for their livelihood. They bring this class action on behalf of themselves and all others similarly situated against Defendants for losses and damages arising out of the catastrophic and avoidable oil spill off the Gulf Coast caused by the April 20, 2010 explosion and fire aboard Defendants' Deepwater Horizon oil rig ("Deepwater Horizon"), and the subsequent sinking of that rig and the discharge of fuel into the surrounding water.

873170.3

2.  On April 20, 2010, Deepwater Horizon, an oil rig in the Gulf of Mexico, exploded and caught fire. It burned for two days before tipping into the sea, on its way bending and breaking the long riser pipe carrying oil to the surface from the seafloor. As the Deepwater Horizon sank, it broke off the riser, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length. The emergency valves, installed on the wellhead for just such a disaster, failed to seal the wellhead as they should have, leaving the wellhead spewing oil into the Gulf waters.

3.  More than 5,000 barrels per day of crude oil have been leaking from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil. The growing, fast-moving, rainbow-colored smear is now large enough to be visible from outer space, covering more than 2,100 square miles, and spreading with the wind and currents towards the Mississippi coastline.

4.  The spilled oil has already caused damage to the Gulf of Mexico's and Mississippi's marine, coastal and estuarine environments, which are used by Plaintiffs and the Class Members to earn their livelihoods. With the wellhead unabated gushing of thousands of gallons of oil per day into the waters near Mississippi, Plaintiffs and Class Members are suffering and will continue to suffer serious losses.

## II.  PARTIES

5.  Cajun Maid, LLC, is a Mississippi corporation that derives its income from the business of commercial shrimping, oystering, and crabbing in and around Harrison County, Mississippi and this judicial district. Cajun Maid, LLC's principal office is in Gulfport, Mississippi.

873170.3

6. Robert Barnett is an adult resident citizen of Harrison County, Gulfport, Mississippi. Mr. Barnett's income is derived from his employment with the Cajun Maid, LLC as a commercial shrimper, oysterman, and crabber.

7. Gulf Shores Sea Products, Inc. is a Mississippi Corporation that derives its income from the purchase and sale of shrimp, oysters, and other seafood in and around Hancock County, Mississippi and this judicial district. Gulf Shores Sea Products, Inc.'s principal office is in Lakeshore, Mississippi.

8. Keath Ladner is an adult resident citizen of Hancock County, Bay St. Louis, Mississippi. Mr. Ladner's income is derived solely from his employment as officer and director of Gulf Shores Sea Products, Inc.

9. As a result of the events described herein, Plaintiffs have suffered ascertainable losses and damages.

10. Defendant BP, PLC is a British corporation, organized under the laws of the United Kingdom, doing business in the State of Mississippi and throughout the Untied States. BP is one of the world's largest oil companies.

11. Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Mississippi and throughout the United States. BP America, Inc. is a subsidiary of BP, PLC.

12. Defendant BP Corporation North America, Inc. (formerly BP Amoco Corporation), is an Indiana corporation with its principal place of business in Houston, Texas, but doing business in the State of Mississippi and throughout the United States. BP Corporation North America, Inc. is a subsidiary of BP America, Inc.

873170.3

13. Defendant BP Company North America, Inc. is a Delaware Corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Mississippi and throughout the United States. BP Company North America, Inc. is a subsidiary of BP Corporation North America, Inc.

14. Defendant BP Products North America, Inc. is a Maryland corporation, with its principal place of business in Houston, Texas, but doing business in the State of Mississippi and throughout the United States. BP Products North America, Inc. is a subsidiary of BP Company North America, Inc.

15. Defendants BP America, Inc., BP Corporation North America, Inc., BP Company North America, Inc. and BP Products North America, Inc. are wholly owned subsidiaries of the global parent corporation, BP, PLC, and they shall be referred to herein collectively as "BP".

16. BP holds the lease granted by the U.S. Minerals Management Service ("MMS") that allows BP to drill for oil and perform oil-production-related operations at the site of the explosion and oil spill. As of April 20, 2010, BP operated the oil well that is the source of the oil spill.

17. Defendant Transocean Ltd. is a Swiss corporation doing business in the State of Mississippi and within this District. Transocean, Ltd. is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

18. Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Mississippi and throughout the United States. Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd.

873170.3

19. Defendant Transocean Offshore Deepwater Drilling, Inc is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Mississippi and throughout the United States. Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean Ltd. Transocean is the world's largest offshore drilling contractor.

20. Defendants Transocean Deepwater, Inc. and Transocean Offshore Deepwater Drilling, Inc.. are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and they shall be referred to herein collectively as "Transocean".

21. Transocean owned, and BP was leasing and operating, the Deepwater Horizon as it performed production well completion operations on the outer continental shelf off the Gulf Coast, at the site from which the oil spill now originates.

22. At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

23. Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with its two headquarters, one in Houston, Texas and one in Dubai, United Arab Emirates, but doing business in the State of Mississippi and throughout the United States. Founded in 1919, today Halliburton is one of the world's largest providers of products and services to the energy industry. Aboard the Deepwater Horizon, Halliburton was engaged in the cementing operations of the well and well cap.

24. Defendant Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron") is a Delaware Corporation with its principal place of business in Houston, Texas, but doing business in the State of Mississippi and throughout the United States. Cameron is a global provider of pressure control, processing, flow control and

873170.3

compression systems as well as project management and aftermarket services for the oil & gas and process industries. It employs approximately 15,000 people. Cameron manufactured and/or supplied the Deepwater Horizon's blowout preventer valves that failed to activate at the time of the explosion. The blowout preventer valves were defective because they failed to operate as intended.

### III. JURISDICTION AND VENUE

25. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business.

26. Jurisdiction is also appropriate under 28 U.S.C. § 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of the State of Mississippi which have been declared, pursuant to 43 U.S.C. § 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated. Title 43 U.S.C. § 1331(1) extends exclusive Federal jurisdiction to the outer continental shelf.

27. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy.

28. This Court's venue over this action is proper under 28 U.S.C. § 1391(a)(2) because Plaintiffs who suffered injury reside in this district.

### IV. FACTUAL ALLEGATIONS

29. Deepwater Horizon was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001. It was owned by Transocean Ltd. and leased to BP through September 2013. It was one of the largest rigs of its kind.

- 6 -

873170.3

30. On April 20, 2010, the Deepwater Horizon was in the final phases of drilling a hole in which casing is cemented in place, reinforcing the well as part of the process of turning it from an exploratory well into a production well. "Cementing" is delicate work that carries the risk of a blowout, which is the uncontrolled release of formation fluids from the well.

31. During the course of this cementing work, an explosion occurred on the Deepwater Horizon and it caught fire. Investigators believe the explosion was a blowout, likely caused by the cementing work the Deepwater Horizon was performing. The fire burned for two days, and the rig began to list progressively more until it finally sank on April 22, 2010, causing the deaths and injuries to many workers on the rig.

32. The Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the Deepwater Horizon sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, now extends from the well to 1,500 feet above the seabed and then buckles back down. Oil is flowing out from the open end of the riser and from two places along its length.

33. Although the now-leaking wellhead is fitted with a blowout preventer ("BOP"), a stack of hydraulically activated valves at the top of the well designed to seal off the well in the event of a sudden pressure release exactly like the one that occurred during the Deepwater Horizon blowout, the response teams have been unable to activate the valves.

34. If the BOP on the wellhead had been functional, it could have been activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the spill to a

minute fraction of its current severity and thereby sparing Plaintiffs and Class Members millions of dollars in losses and damage.

35. At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters. The ever-expanding oil slick made landfall on Friday morning, April 30, 2010, and will continue to affect more and more Gulf coastline as it is driven landward by currents and winds. Although BP has begun drilling a relief well to stop the flow to the leaking well, the relief well may take months to complete, while oil continues to flow out of the leaking well.

36. The oil will cause severe damage to the delicate wetlands and intertidal zones that line the coast of Mississippi, destroying the habitats where fish, shellfish, and crustaceans breed, spawn, and mature.

37. The timing of this disaster makes it even more damaging, as May is spawning season for some sea life and migration time for the young of some species of shrimp.

38. Such devastation at the literal source of life for so many species will severely damage and perhaps even destroy the livelihoods of the Plaintiffs and Class Members, who rely on this sea life for their livelihoods.

39. The Gulf region accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output, while nearly a third of all marine recreational fishing trips take place on Gulf waters, according to the Fisheries Service of the National Oceanographic and Atmospheric Administration.

40. The risks of offshore drilling are well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other seas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot

873170.3

sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

41. Moreover, Defendants knew the work the Deepwater Horizon was performing was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Deepwater Horizon was doing when it exploded.

42. Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, most in the Gulf of Mexico. Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991. Nearly all the blowouts examined occurred in the Gulf of Mexico.

43. Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work. During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

44. The threat of blowouts increases as drilling depth increases. Deepwater Horizon was drilling in 5,000 feet of water, to a total depth of 18,000 feet. Defendants were aware of the high risk of blowouts from such deep drilling.

45. In 2009, Defendant BP spent $16 million lobbying the Federal government on issues including encouraging less restricted drilling on the continental shelf, despite its knowledge of the high risks involved.

46. Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management

Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon incident is a tragic example to the contrary.

47. The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of Defendants, which renders them liable jointly and severally to Plaintiffs and the Class Members for all their damages.

48. Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs, the Class Members, Mississippi's and the Gulf of Mexico's marine and coastal environments and estuarine areas, where Plaintiffs and the Class Members work and earn a living. Moreover, additional safety mechanisms, technologies, and precautions were known and available to Defendants, but Defendants chose not to employ them on the Deepwater Horizon.

49. After the explosion, Defendants attempted to downplay and conceal the severity of the oil spill. Their initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels of oil per day. Moreover, Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

50. The oil spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses who cannot use the Gulf of Mexico and Mississippi's shore to work and to earn a living.

51. There are many other potential effects from the oil spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

873170.3

## V. CLASS DEFINITION

52. Plaintiffs bring this action on behalf of themselves and all others similarly situated, who are members of the following Class:

> All Mississippi residents who claim injury and/or damages as a result of the April 20, 2010 fire and explosion which occurred aboard the Deepwater Horizon drilling rig and the resulting oil spill.

53. Excluded from the Class are:

   (a) the officers and directors of any of Defendants;

   (b) any judge or judicial officer assigned to this matter and his or her immediate family; and

   (c) any legal representative, successor, or assign of any excluded persons or entities.

## VI. CLASS ACTION ALLEGATIONS

54. Plaintiffs' claims are made on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

### A. Numerosity Of The Class

55. On information and belief, the Class consists of hundreds or thousands individuals and/or businesses who have been legally injured by the disaster, making joinder impracticable.

### B. Typicality

56. The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, have suffered adverse effects proximately caused by the disaster.

57. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class.

C. **Adequacy**

58. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort, and complex class actions, including actions involving environmental contamination and, specifically, catastrophic oil spills.

59. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their Counsel have interests adverse to those of the Class.

D. **Predominance Of Common Questions Of Fact And Law**

60. There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class Members and include, but are not limited to, the following:

(a) Whether Defendants caused and/or contributed to the explosion, fire and oil spill;

(b) Whether Defendant were negligent in the design, maintenance, manufacture, and/or operation of the of the oil rig, its pipes, valves, and other machinery and materials;

(c) Whether Defendants knew or should have known of the risk of a major failure of the rig such as that which caused it to fail and resulted in the explosion, fire and oil spill;

873170.3

(d) Whether Defendants knew or should have known that their activities would cause damage to Plaintiffs;

(e) Whether Defendants acted maliciously or with reckless disregard to the risk of a major failure of the rig, its pipes, valves, and other machinery and materials; and

(f) The amount of damages Plaintiffs and the Class Members should receive in compensation.

### E. Superiority

61. Absent class treatment, Plaintiffs and Class Members will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

62. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex environmental cases such as this, few could likely seek their rightful legal recourse. Absent a class action, Class Members would continue to incur harm without remedy.

63. The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

### FIRST CLAIM FOR RELIEF
### Negligence

64. Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

65. The blowout explosion, fire, and resulting oil spill were caused by the concurrent negligence of the Defendants.

873170.3

66. Upon information and belief, Plaintiffs allege that the disaster was the result of Defendants' joint negligence in:

    (a)    Failing to properly maintain and/or operate the Deepwater Horizon;

    (b)    Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

    (c)    Failing to properly inspect the Deepwater Horizon to assure that all equipment and personnel were fit for their intended purpose;

    (d)    Acting in a careless and negligent manner;

    (e)    Failing to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon, which would have prevented the disaster;

    (f)    Failing to take appropriate action to avoid or mitigate the accident;

    (g)    Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

    (h)    Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

    (i)    Failure to timely warn;

    (j)    Failure to timely bring the oil release under control;

    (k)    Failure to provide appropriate disaster prevent equipment;

    (l)    Acting in a manner that justifies imposition of punitive damages; and

    (m)    Such other acts and omissions as will be shown at the trial of this matter.

67. The injuries to Plaintiffs and the Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

68. Furthermore, the disaster would not have occurred had the Defendants exercised the high degree of care. Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

69. Plaintiffs and the Class Members are entitled to a judgment finding Defendants liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' acts and omissions.

## SECOND CLAIM FOR RELIEF
### Gross Negligence

70. Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

71. Defendants owed a duty to all Plaintiffs and Class Members to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

72. Defendants had a heightened duty of care to all Plaintiffs and the Class Members because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that Deepwater Horizon was performing at the time of the explosion.

73. Defendants breached their legal duty to Plaintiffs and the Class, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of others, including Plaintiffs and the Class Members, in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

74. Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the economic interests of individuals and businesses in the area affected by the oil spill.

75. As a direct and proximate result of Defendants wanton or reckless conduct, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of livelihood, loss of income, and other economic loss.

76. Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

### THIRD CLAIM FOR RELIEF
### Negligence *Per Se*

77. Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

78. Defendants' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the Deepwater Horizon is governed by numerous state and federal laws, and permits issued under the authority of these laws.

79. These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs and the Class Members.

80. Defendants' violations of these statutory standards constitute negligence *per se* under Mississippi law.

81. Defendants' violations of these statutory standards proximately caused Plaintiffs' and the Class Members' injuries, warranting compensatory and punitive damages.

873170.3

## FOURTH CLAIM FOR RELIEF
### (Oil Pollution Act of 1990)

82. Plaintiffs, on behalf of themselves and the Class Members, reallege each and every allegation set forth above.

83. The Oil Pollution Act imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the "damages that result from such incident." 33 U.S.C. § 2702.

84. Section 2702(b)(2)(C) provides for the recovery of "[d]amages for subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

85. As a result of the disaster, Plaintiffs and the Class Members have suffered the type of damages that may be recovered pursuant to the Oil Pollution Act, and they demand compensation from Defendants in amounts to be determined by the trier of fact.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants, jointly and severally, as follows:

A. An order certifying the Class as set forth herein, appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as counsel for the Class;

B. Economic and compensatory damages in amounts to be determined at trial;

C. Punitive damages;

D. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

E. Attorneys' fees and costs;

873170.3

F.  Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate; and

G.  A trial by jury as to all Defendants.

## JURY DEMAND

DATED: April 30, 2010

*Don Barrett*
Don Barrett (MSB # 2063)
David McMullan (MSB # 8494)
Brian Herrington (MSB # 10204)
DON BARRETT, P.A.
P.O. Box 987
Lexington, MS 39095
Telephone: (662) 834-9168

Richard R. Barrett (MSB # 99108)
LAW OFFICES OF RICHARD R. BARRETT
P.O. Box 339
404 Court Square North
Lexington, MS 39095
Telephone: (662) 834-4960

Charles Barrett (*pro hac vice* to be filed)
BARRETT & ASSOCIATES, P.A.
6518 Hwy. 100, Suite 210
Nashville, TN 37205
Telephone: (615) 515-3393

Randall A. Smith (*pro hac vice* to be filed)
Zach Butterworth (*pro hac vice* to be filed)
Hiawatha Northington, II (MSB # 10831)
SMITH & FAWER, L.L.C.
201 St. Charles Avenue, Suite 3702
New Orleans, LA 70170
Telephone: (504) 525-2200

873170.3

Zach Butterworth (MSB # 9946)
Gary Yarborough, Jr. (MSB # 102310)
HESSE & BUTTERWORTH, PLLC
841 Highway 90
Bay St. Louis, MS 39520
Telephone: (228) 466-0020
Facsimile: (228) 466-0550

Larry D. Moffett (MSB #3401)
Brenda Long (MSB #8663)
DANIEL COKER HORTON & BELL, P.A.
265 North Lamar Boulevard, Suite R
P.O. Box 1396
Oxford, MS 38655-1396
Telephone: (662) 232-8979
Facsimile: (662) 232-8940

Edward C. Taylor (MSB #9043)
DANIEL COKER HORTON & BELL, P.A.
1712 15th Street, Suite 400
Post Office Box 416
Gulfport, MS 39502-0416
Tel: 228-864-8117
Fax: 228-864-6331

Dewitt M. "Sparky" Lovelace (MSB # 1449)
LOVELACE LAW FIRM, P.A.
12870 U.S. Highway, 98 West, Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Facsimile: (850) 837-4093

Elizabeth A. Alexander (*pro hac vice* to be filed)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue N., Suite 1650
Nashville, TN 37219
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

873170.3

Steven E. Fineman (*pro hac vice* to be filed)
Wendy R. Fleishman (*pro hac vice* to be filed)
Annika K. Martin (*pro hac vice* to be filed)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Elizabeth J. Cabraser (*pro hac vice* to be filed)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiffs and the Class*

873170.3